*Law Offices*
**MORGAN, LEWIS & BOCKIUS, LLP**
**(A Pennsylvania Limited Liability Partnership)**
**101 Park Avenue**
**New York, NY  10178**
**Amber L. Kagan**
**Kimberley E. Lunetta**
**Attorneys for Defendant**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------- x

ALICE WEISS,                                     :
                                                 :
               Plaintiff,                        :
                                                 :        05-CV-3310 (GBD)
        - against -                              :
                                                 :        **DEFENDANT MORGAN STANLEY**
MORGAN STANLEY INVESTMENT                         :        **INVESTMENT MANAGEMENT INC.'S**
MANAGEMENT,                                       :        **STATEMENT OF UNDISPUTED**
                                                 :        **MATERIAL FACTS IN SUPPORT OF ITS**
               Defendant.                         :        **MOTION FOR SUMMARY JUDGMENT**
---------------------------------------------------- x
                                                          ***Document Electronically***
                                                          ***Filed***

        Pursuant to Local Rule 56.1, Defendant Morgan Stanley Investment Management Inc. ("Morgan

Stanley" or the "Firm") provides the following Statement of Undisputed Material Facts in Support of its

Motion for Summary Judgment:

**A.      Morgan Stanley Investment Management**

        1.       Morgan Stanley Investment Management Inc. is a global provider of investment products

and services.  See Affidavit of Thomas Moore ("Moore" Aff.) at ¶ 2.

        2.       For the duration of its existence, the Global Investor Group (the "GIG") was a part of

Morgan Stanley Investment Management and provided global investment management services to Firm

clients.  See Moore Aff. at ¶ 3; Pl. Dep. at 110 - 11.[1]

---
[1]      Relevant pages of Plaintiff's deposition transcript and attached to the Affidavit of Kimberley E. Lunetta, Esq.
("Lunetta Aff.") as Exhibit 3.

3.      The GIG employed a decentralized approach to portfolio management, in which independent teams had control over investment decisions.  See Moore Aff. at ¶ 4.

4.      Each team, which was comprised of portfolio managers, analysts and support staff, developed its own investment strategies under the guidance of a team leader.  See Moore Aff. at ¶ 5.

**B.      Plaintiff's Application for Employment With Morgan Stanley**

5.      On February 22, 1981, Plaintiff completed an application for employment with Dean Witter, which later merged with Morgan Stanley.  See Lunetta Aff. at Exhibit 75 [MS A24313-17].  In that application, in response to the question whether she had "ever been discharged or forced to resign from any position," Plaintiff responded, "No."  Id.  [MS A24314].  However, in her letter to the EEOC, which Morgan Stanley first received with Plaintiff's initial disclosures on March 8, 2007, Plaintiff stated that she had been involuntarily terminated from Basche & Co.  See Lunetta Aff. at Exhibit 66.  In her deposition testimony in this litigation, Plaintiff testified that she was involuntarily terminated from Basche & Co.  Pl. Dep. at 26-27.

6.      In her letter to the EEOC, as well as in her deposition testimony, Plaintiff stated that she thought her termination from Basche & Co. was discriminatory.  See Lunetta Aff. at Exhibit 66; Pl. Dep. at 13-14.  She further testified at her deposition that she filed an EEOC Charge based on this termination, alleging gender, religious and "perhaps" national origin discrimination.  Pl. Dep. at 13-14.

7.      In addition, in the section of the employment application which seeks information concerning prior employment, Plaintiff indicated that she voluntarily left her employment with Basche & Co. due to "maternity."  See Lunetta Aff. at Exhibit 75 [MS A24315].  In her deposition, Plaintiff acknowledged that this information was inaccurate.  Pl. Dep. at 40-41.

8.      In the section of the employment application seeking information relating to any gaps in employment, Plaintiff indicated she was out of work due to maternity leave from January 1981 through

September 1981.  <u>See</u> Lunetta Aff. at Exhibit 75 [MS A24315].  In her letter to the EEOC and her

position, Plaintiff stated that the child, for whom she took this maternity leave, was born on July 26,

1980.  <u>See</u> Lunetta Aff. at Exhibit 66 [WEISS 45].  Plaintiff further testified that she took maternity

leave from July 1980 through December 1980, at which time she attempted to return to Basche & Co.

<u>Pl. Dep.</u> at 26; 40-41.  Plaintiff testified that she was not permitted to return to Basche & Co after this

leave, and was instead terminated.  <u>Pl. Dep.</u> at 26.

       9.     Plaintiff testified that she was not out on maternity leave from January 1981 through

September 1981, but rather was unemployed and/or held various temporary jobs during this time period,

which was immediately following her termination from Basche & Co. and preceding her next regular

employment.  <u>Pl. Dep.</u> at 29-30.

       10.    Plaintiff acknowledged hat the information concerning the reason for and circumstances

surrounding her termination from Basche & Co. (as well as the gap in employment immediately

thereafter) was inaccurate.  <u>Pl. Dep.</u> at 44 - 45.

       11.    The employment application completed by plaintiff clearly states:

> ANY OMISSION OR FALSIFICATION OF ANY ANSWER,
> FOR ANY REASON WHATSOEVER, IS CONSIDERED BY
> DEAN WITTER REYNOLDS INC. TO BE GROUNDS FOR
> DISMISSAL.

<u>See</u> Lunetta Aff. at Exhibit 75 [MS A24315].

       12.    Morgan Stanley has terminated employees for providing false information on

employment-related forms and/or applications, which has, in some instances, included misstatements

concerning dates of prior employment to conceal gaps in the individual's employment history.  <u>See</u>

Hosansky Aff. at ¶ 13.

**C.**     **Plaintiff's Employment with Morgan Stanley**

13.     On March 8, 1982, Morgan Stanley hired Plaintiff as a Statistician.  Complaint ¶ 14; Pl. Dep. at 73-74; see Lunetta Aff. at Exhibit 10 [MS A24517].

14.     In 1985, Morgan Stanley promoted Plaintiff to an Assistant Vice President title.  Pl. Dep. at 112 – 14.

15.     In 1987, Morgan Stanley promoted Plaintiff to a Junior Portfolio Manager position.  Pl. Dep. at 112; see Lunetta Aff. at Exhibit 11 [MS A24379].

16.     In 1989, Morgan Stanley promoted Plaintiff to a Portfolio Manager position**.**  Pl. Dep. at 124 - 25; see Lunetta Aff. at Exhibit 12 [MS A24407 - 09].

17.     In 1990, Morgan Stanley promoted Plaintiff to a Vice President Title.  Pl. Dep. at 132; see Lunetta Aff. at Exhibit 13 [MS A24413 - 17].

18.     During her employment with Morgan Stanley, Plaintiff worked in the GIG's Core Growth team.  Jung Dep. at 115 - 16; 120.[2]  The Core Growth team was divided into two areas, those responsible for active funds and those responsible for index funds.  Gupta Dep. at 50;[3] Merin Dep. at 100.[4]

19.     Index funds are tied to a particular index, such as the Standard & Poor's ("S&P") 500, and generally invest only in those stocks that are represented in the index, and/or securities that represent proxies for the index.  See Moore Aff. at ¶ 6.  Management of such a fund is basically formulaic.  The manager generally buys shares of the same stocks, and in the same proportion, as held in the relevant index.  Id. at ¶ 7.

---

[2]     Pertinent portions of Kevin Jung's Deposition are attached to the Lunetta Aff. as Exhibit 4.

[3]     Pertinent portions of Rajesh Gupta's Deposition are attached to the Lunetta Aff. as Exhibit 5.

[4]     Pertinent portions of Mitchell Merin's Deposition are attached to the Lunetta Aff. as Exhibit 6.

20.     Active funds, on the other hand, can invest in any stocks, within the confines of the applicable prospectuses.  Active portfolio managers decide which stocks to invest in and what proportion each such stock should represent in the fund.  Pl. Dep. at 148 - 49; Jung Dep. at 16 - 17.

21.     Plaintiff worked in the index side of the Core Growth team.  See Affidavit of Caren Hosansky ("Hosansky" Aff.) at ¶ 2.  From 1987 through the end of her employment, Plaintiff managed Morgan Stanley's Value Added Market Series Mutual Fund (the "Value Added Fund" or the "Fund"), a fund that she proposed and Morgan Stanley launched.  Pl. Dep. at 130; see Lunetta Aff. at Exhibit 14 [MS A24410].

22.     Although the Value Added Fund was considered an Index Fund because it was tied to the S&P 500, there was no precise index that matched that Fund.  Pl. Dep. at 138 - 39; 143 - 44.  Specifically, the S&P 500 was market weighted, not equally weighted like the Value Added Fund.  Pl. Dep. at 143 - 44; 155.  This difference, according to Plaintiff, required her to more actively manage the Fund than would be required of a pure Index Fund.[5]  Pl. Dep. at 143 - 44; 150 - 54.

23.     In 2001, Plaintiff was also given the KLD Social Index Fund to manage.  This fund was also an Index fund.  Pl. Dep. at 137; 193 - 99.

24.     In or around 2003, S&P launched an equally weighted index, which was to be rebalanced quarterly.  At that point, the Fund became a purely passive index fund.  Pl. Dep. 505.

25.     Plaintiff remained in the Core Growth team until that team was restructured in connection with a 2003 reorganization of the GIG.  See Hosansky Aff. at ¶ 3.

26.     At that time, 54 individuals, including Plaintiff, were let go.  Pl. Dep. at 551; 555-56; see Lunetta Aff. at Exhibit 15 [MS A27518; 27526 - 34].  Mr. Rutherfurd was removed from his position as

---

[5]     Defendants accept this position as true only for purposes of this motion.

Managing Director of the Core Growth Team and converted to a Senior Advisor, a consultative role without any direct reports.  Rutherfurd Dep. at 12-13; 52;[6] Merin Dep. at 36.

27.    Two other individuals from the Core Growth team, Gus Scacco and Brian Mazella, were also let go.  Pl. Dep. at 552; see Exhibit 15 to Lunetta Aff. [MS 27518; 27526 - 34].

28.    At the time of the reorganization, the Core Growth team was headed by Guy Rutherfurd and consisted of 16 individuals.  Of those 16 employees, 6 were minorities; 5 were women; and 5 were over 40, including Mr. Rutherfurd who was 64 at the time.  See Lunetta Aff. at Exhibit 16 [MS A27580].

**D.     The Promotion Process at Morgan Stanley**

29.    At Morgan Stanley, employees hold functional positions, which relate to the responsibilities the individuals perform, and can also hold corporate titles.  See Hosansky Aff. at ¶ 4.

30.    Although the precise corporate titles have changed over the years, from time to time, Morgan Stanley has had the titles of Assistant Vice President, Vice President, Executive Director and Managing Director.  See Lunetta Aff. at Exhibit 10 [MS A24517].

31.    The requirements for being promoted differ depending on which title is being considered. See Lunetta Aff. at Exhibit 17 [MS A28019 - 35] and 18 [MS A 24708 - 26].

32.    More is expected in order to be promoted to the higher level titles.  See Lunetta Aff. at Exhibit 17 [MS A28019 - 35 and 24708 - 26].

33.    The Executive Director ("ED") title is an extremely senior position at Morgan Stanley. Pl. Dep. at 560.  Key characteristics of an ED "must include accountability for executing strategy within broadly defined parameters and the management of significant resources.  Decisions have significant impact on division results."  See Lunetta Aff. at Exhibit 17 [MS A28019 - 35].  Further, an ED must

---

[6]    Pertinent portions of Guy Rutherfurd's deposition transcript are attached to the Lunetta Aff. as Exhibit 7.

have "broad accountability for managing divisional businesses and functions."  See Lunetta Aff. at

Exhibit 19 [MS A24714].  In addition, there are a number of core competencies required for promotion

to that level, including demonstrating leadership, mentoring and team building within and across the

individual's own team/business area, functional area and the Firm.  See Lunetta Aff. at Exhibit 18 [MS

A24708 – 26].

34.     To be promoted to an ED, an employee must do more than have longevity with the Firm.

Pl. Dep. at 559; see Lunetta Aff. at Exhibit 17 [MS A28019 - 35].  Rather, employees must "seek

personal challenges to contribute beyond [their] identified responsibilities," and show a strength in,

among other things, the areas of leadership, teamwork and contribution to the Morgan Stanley franchise.

See Lunetta Aff. at Exhibit 17 [MS A28019 - 35].  Simply continuing to do a good job and performing

the same responsibilities, without more, does not qualify an employee for a promotion.  Merin Dep. at

64-65.

35.     Officer promotions are determined once a year.  Pl. Dep. at 557 - 58.  Final promotion

decisions are made and communicated to employees in December.  See Lunetta Aff. at Exhibit 17 [MS

A28019 - 35].

36.     In 2003, managers, including Mr. Rutherfurd, submitted individual promotion

recommendations to upper management in October.  See Exhibits 21 [MS A25013 -16] and 22 [28043 -

56] to Lunetta Aff.  Given Plaintiff's September 2003 termination as part of the RIF, the last promotion

opportunity for her was December 2002.  See Lunetta Aff. at Exhibits 17 [MS A28019 – 35] and 23

[MS A28019-35].

37.     Information regarding the promotion process, schedule and criteria is posted on the

Morgan Stanley Investment Management website, and is accessible by employees.  See Hosansky Aff.

at ¶5.

38.     Given the senior level of the ED title, it is not uncommon for employees to plateau at the Vice President level.  Pl. Dep. at 562 - 65; Merin Dep. at 63-65.  While Plaintiff did not make it past this level, neither did several other employees, with seniority comparable to Plaintiff's, within the Core Growth team.  For instance, Thomas Copper, who began working for Morgan Stanley in 1986, (Lunetta Aff. at Exhibit 24 [MS A27476 - 77]), John Livingstone, who began working for Morgan Stanley in 1989, (Lunetta Aff. at Exhibit 25 [MS A27480 - 81]), and Thomas Moore, who began working for Morgan Stanley in 1994 (Lunetta Aff. at Exhibit 26 [MS A27484 - 85]), were all at the Vice President level at the time of Plaintiff's termination.

**E.      Plaintiff's Compensation**

39.     As compared to the other five Vice Presidents in the Core Growth in 2002, all of whom were men, Plaintiff received the second highest bonus, in the amount of $125,000.00, and second highest total compensation award, in the amount of $250,000.00.  See Lunetta Aff. at Exhibit 27 [MS A27524-25].

**F.      Plaintiff's Performance Reviews**

40.     Until 2000, employees at Morgan Stanley were reviewed by their supervisors in a traditional top-down evaluation process. See Hosansky Aff. at ¶ 6.

41.     Until 2000, when the review process changed, Plaintiff was evaluated very favorably in virtually all categories, receiving the highest and/or second highest rankings Pl. Dep. at 277; see Lunetta Aff. at Exhibits 28 [MS A24384 – 85], 29 [MS A24399 – 400], 30 [MS A24408 – 09], 31 [MS A24415 – 24416], 32 [MS A24421 -22], 33 [MS A 24426 – 27], 34 [MS A24436 – 37], 35 [MS A24439 – 40], 36 [MS A24444 – 45], 37 [MS A24447 – 48], 38 [MS A24451 – 52], 39 [MS A24453 – 54], 40 [MS A24352 - 53].

42.    Plaintiff received these favorable reviews from each of her supervisors over the years, including Messrs. Vander Vliet, Connelly, Hinchliffe and Rutherfurd, all of whom she accuses of discrimination.  See Exhibits 28 through 40; Pl. Dep. at 46.

43.    Beginning in 2000, MSIM reviews were done using a 360 review process.  See Lunetta Aff. at Exhibit 41 [MS A24458 - 65].  Under this new process, employees select the individuals from whom feedback is sought, including individuals above, equal to and below them in the reporting structure.  Pl. Dep. at 277; 196 – 97; see Hosansky Aff. at ¶7.

44.    Under the 360 process, employees were rated on a scale of 1 to 5 or on a scale of 1 to 10, depending upon the year, with 1 being the least favorable and 5 or 10 being the most favorable.  See Hosansky Aff. at ¶7; see Lunetta Aff. at Exhibit 41 [MS A24460].

45.    In 2002, five individuals rated Plaintiff's performance.  Some of Plaintiff's individual ratings included:  (1) 3.3 for "identifies and pursues new opportunities to add value;" (2) 3.5 for "participates in task forces and committees on behalf of the Firm;" and (3) 3.3 for "leads by example and motivates others to achieve goals."[7]  See Lunetta Aff. at Exhibit 41 [MS A24458-65].

46.    In her 2002 review, Plaintiff received an overall rating of 3.4 in "Entrepreneurial Spirit;" 3.5 in "Leadership;" and 3.5 in "teamwork."  See Lunetta Aff. at Exhibit 42 [MS A24466 - 85].  Plaintiff acknowledged that these ratings, while average, were not "stellar marks" and may not have been sufficient to support a promotion to the ED level.  Pl. Dep. at 566-67.

47.    In 2002, Plaintiff was rated by four individuals of her choosing, and Mr. Rutherfurd, her immediate supervisor.  See Lunetta Aff. at Exhibit 42 [MS A24466 - 85].  Plaintiff gave herself ratings ranging from 4.7 - 5.0, but her evaluators provided her with lower ratings.

---

[7] Due to the terrorist attacks that occurred on September 11, 2001, and the impact on Morgan Stanley's offices, reviews were not completed for 2001.

48.     In her 2002 review, Anita Kolleeny, a former Managing Director with Morgan Stanley who Plaintiff does not believe discriminated against her, rated Plaintiff lower than Mr. Rutherfurd rated her.  Pl. Dep. at 312; see Lunetta Aff. at Exhibit 42 [MS A24466 - 85].

49.     In 2002, Mark Bavoso, a Managing Director, whom Plaintiff selected as an evaluator, commented:  "I would encourage Alice to be more involved with the direction of the firm . . . Her outstanding performance has unfortunately been hampered by her lack of interest in participating in more MSIM department initiatives."  See Lunetta Aff. at Exhibit 42 [MS A24466 - 85] at MS 24483; Rutherfurd Dep. at 95.

50.     The feedback portion of Plaintiff's 2003 review was completed prior to her termination.  See Lunetta Aff. at Exhibit 43 [MS A28079-93].  In this review, Plaintiff received a 6.0 rating (out of 10) from her peers in "client impact," a 7.3 in "leadership," and a 7.6 in "teamwork."  Id.  She gave herself scores of 9.5, 9.3 and 9.4, respectively.

51.     Within the general core competency of "teamwork," plaintiff received a rating of only 6.2 in the specific area of "contribut[ing] even when the work is not directly related to one's work," while she gave herself a 9.0 in this area.  Id. at MS A28086.

52.     In Plaintiff's 2003 review, Aaron Clark, an Executive Director on the Core Growth Team, said that Plaintiff "does not seem to contribute much outside of her area . . . missed on some deadlines particularly when it related to the rebalancing of her fund . . . and does not take the blame for her mistakes."  Id. at MS A28090.  Mr. Clark observed that "other people have stepped in and taken the blame for her on mistakes that have been made."  Id.

53.     Other development areas were identified by Anita Kolleeny, Guy Rutherfurd, Tom Moore and Alpana Sen.  Id. at MS A28086.

G.    **The Value Added Fund**

54.    In or around 1987, while Plaintiff held the position of Statistician, she presented a new fund concept, an equally weighted S&P 500 Index Fund, to Morgan Stanley.  Pl. Dep. at 130.

55.    Morgan Stanley adopted Plaintiff's fund concept and launched the "Value Added Fund" in 1987.  Pl. Dep. at 130; see Lunetta Aff. at Exhibit 14 [MS A24410].  Morgan Stanley promoted Plaintiff to a Junior Portfolio Manager so that she could assist in the management of the Fund.  See Lunetta Aff. at Exhibit 11 [MS A24379].

56.    After Plaintiff was promoted to Portfolio Manager, she became primarily responsible for the management of the Fund.  Pl Dep. at 130.

57.    The Value Added Fund invests in a diversified portfolio of common stocks represented in Standard and Poor's 500 Composite Stock Price Index ("S&P 500").  However, unlike the S&P 500, where stocks are represented in proportion to their market value, this Fund invests in each stock contained in the S&P 500 in approximately equal proportions.  Therefore, the Fund should hold approximately 0.2% of each stock at any given time.  Gupta Dep. at 23.

58.    The Value Added Fund's prospectus, which is filed with the Securities and Exchange Commission and is provided to investors, states that the Fund will be "approximately equally weighted." Fund managers are required to manage their funds within the confines of the prospectus.  Pl. Dep. at 160-61.

59.    In order to ensure that the stocks in the Fund are held in approximately equal proportions, rebalancing of the Fund portfolio is necessary.  A formal rebalancing, which is done on a regular basis determined by the prospectus, requires the selling of shares that are overweighted in the fund (ie, held in proportions greater than .2%) and the purchase of shares that are underweighted (i.e., held in proportions less than .2%).  Gupta Dep. at 110 – 11.

60.     In between formal rebalancings, the fund manager can maintain the approximate equal weighting by allocating cash inflows and outflows to purchase and /or sell stocks that have drifted from an approximately equal weight.  Pl. Dep. at  140 - 41.

61.     Fund management for the Value Added Fund, or any fund, has the authority to narrow the parameters within which a Portfolio Manager can manage the fund, regardless of any broader limits set by the prospectus.  Pl. Dep. at 165 - 66; 171-72.

## H.     The Rebalancing Issue

62.     Over the course of the Plaintiff's employment with Morgan Stanley, the parameters for rebalancing the Value Added Fund were discussed.

63.     Initially, the prospectus required that the Fund be rebalanced at least quarterly.  Pl. Dep. at 172; see Lunetta Aff. at Exhibit 44 [MS A25858; 25863].

64.     As a result of tax consequences associated with quarterly rebalancing, Plaintiff requested that the rebalancing be done less frequently.  Pl. Dep. at 176.  In 1999, Plaintiff requested that the rebalancing be changed to semi-annually.  See 2/3/99 memo from Kenton Hinchliffe, attached as Exhibit 45 to Lunetta Aff. [MS A27792 -93].  In 2000, Plaintiff requested that the rebalancing be changed to "at least annually."  Pl. Dep. at 178-81; 187-89; see Lunetta Aff. at Exhibit 20 [Weiss 97].

65.     In addition, Plaintiff began suggesting changes to the range within which the stocks must be rebalanced to be deemed "approximately equally weighted."  In 1999, Plaintiff suggested that stocks be rebalanced within a range of 0.16% - 0.24%.  See Lunetta Aff. at Exhibit 45 [MS A27792 -93].

66.     In 1999, Plaintiff's supervisor, Ken Hinchliffe, disagreed with widening the acceptable rebalancing range because, according to him, "widening the trading bands . . .will quickly be recognized by our FAs or shareholders or by Morningstar and will be viewed as an abandonment of the equal-weighted strategy . . . ."  See Lunetta Aff. at Exhibit 46 [MS A27794].

67.     During the Fall 2002, the performance and management of the Fund was examined.  Pl.
Dep. at 491 - 93; Rutherfurd Dep. at 37; see emails by and among Thomas Moore, Alice Weiss, and
others, dated October 4, 2002, December 5 and December 10, 2002, attached to Lunetta Aff. at Exhibits
47 [MS A24191 - 92] and 48 [MS A24193 - 96], respectively.

68.     Tom Moore, a member of the Core Growth Team who was charged with certain
managerial and administrative functions for the Team, was asked by Mr. Gupta, the Chief
Administrative Officer for the GIG, to spearhead a review of the management and performance of the
Value Added Fund.  See Moore Aff. ¶ 9.  As a result of his review, Mr. Moore came to the conclusion
that (1) the Fund managed by Plaintiff had not been rebalanced "at least annually," (See Lunetta Aff. at
Exhibit 49 [MS A24309-10]); and (2) that the stocks within the fund were not at or near 0.2% (Moore
Aff. ¶11)).

69.     A review of the fund showed that, as of March 2003, 237 stocks were outside the range
of .15 - .25%.  See Moore Aff. ¶ 12; see also, Lunetta Aff. at Exhibit 50 [MS A27928].

70.     That same review showed that 89 stocks were outside of a .10 - .30 % range.  See Moore
Aff. ¶ 12; see also, Lunetta Aff. at Exhibit 50 [MS A27928].

71.     Based on the findings of his analysis, Mr. Moore believed that Plaintiff had not been
managing the Fund consistent with the parameters set forth in the Value Added Fund prospectus.  See
Moore Aff. ¶ 13; see also Gupta Dep. at 110-11; Rutherfurd Dep. at 38; McAlinden Dep. at 37-39.[8]

72.     Mr. Moore had several discussions with Mr. Rutherfurd, Mr. Gupta and/or Mr.
McAlinden about the management of the Fund.  See Moore Aff. ¶ 14.  In one of these discussions, the
idea of terminating Plaintiff's employment was discussed.  Gupta Dep. at 115-16; Rutherfurd Dep. at 39,

---

[8]     Pertinent portions of Joseph McAlinden's Deposition transcript are attached to the Lunetta Aff. as Exhibit ___.

111.  Mr. Rutherfurd objected to such a termination and, instead, recommended that Plaintiff be more closely supervised.  See Moore Aff. ¶ 14; see also Rutherfurd Dep. at 39.

73.     In connection with the review of the Fund, discussions were held about setting new rebalancing guidelines.  A series of meetings and communications were held in which proposals were made and presented to the fund board about the frequency of rebalancing and the weightings criteria to be used.  See Lunetta Aff. at Exhibits 47 [MS A24191- 92, 48 [MS A24193 – 94, 51 [MS A27866], 52 [MS A24197 – 98], 53 [MS A27873 - 74].

74.     After many discussions and negotiations with the Board, the conclusion was that the Value Added Fund was to be rebalanced quarterly and that "approximately equally weighted" meant that all stocks were to be within a range of 0.19 - 0.21%.  Rutherfurd Dep. at 38; 43; see Lunetta Aff. at Exhibit 54 [MS A24299].

75.     Mr. Rutherfurd spoke to Plaintiff about these requirements and sent a memo to Mr. Gupta, on which Plaintiff was copied.  Rutherfurd Dep. at 43; see Lunetta Aff. to Exhibit 55 [MS A24199].  In his memo, dated June 19, 2003, Mr. Rutherfurd explained that they would implement these new parameters for the June 30th rebalancing.

76.     On June 24, 2003, just prior to the June 30, 2003 rebalancing, Mr. Rutherfurd left for a meeting in Colorado, expecting Plaintiff to rebalance the Value Added Fund as directed.  Rutherfurd Dep. at 43.  Upon his arrival, he received by facsimile an email Plaintiff had sent to Mr. Gupta, copying Mr. Rutherfurd and others, stating:

> Raj,
>
> This is to confirm the last stage of the June 30th rebalancing so that we are all in agreement. The portfolio will be rebalanced on Monday, June 30th based on the prior Friday, June 27th prices. The position size of each company in the S&P 500 will be in the range of 19 to 21 basis points. (Positions with 18.5 basis points or higher will be rounded up and conversely, positions with 21.5 basis points or lower will be rounded down). Exception to the above will be companies with so called "impaired credit".

Please respond to this e-mail as acknowledgement to the above.

Alice Weiss

<u>See</u> email dated June 24, 2003 attached to Lunetta Aff. at Exhibit 56 [MS A24200].

77.     Mr. Rutherfurd, who interpreted Plaintiff's June 24, 2003 email as directly contradicting management's directive to rebalance each position in the Fund to within 19 and 21 basis points, was very upset when he received Plaintiff's June 24, 2003 email.  <u>Rutherfurd Dep.</u> at 43 - 44; <u>Donna (formerly Lee) Litvinsky's Deposition</u> ("<u>Litvinsky Dep.</u>") at 50 - 51;[9] <u>Gupta Dep.</u> at 114.

78.     On June 24, 2003, Mr. Rutherfurd called Plaintiff at home and told her to stay home the next day, June 25, 2003.  <u>Plaintiff's Dep.</u> at 531; <u>Rutherfurd Dep.</u> at 44; <u>Litvinsky Dep.</u> at 53; <u>see</u> memo from G. Rutherfurd dated June 25, 2003 re: why he asked Plaintiff to stay home, attached to Lunetta Aff. as Exhibit 57 [MS A24201-02].  Mr. Rutherfurd then spoke to Morgan Stanley's Human Resources Representative for the GIG, Donna (Lee) Litvinsky, explained what happened and indicated that he had directed Plaintiff not to come to work the next day.  <u>Rutherfurd Dep.</u> at 44; <u>Litvinsky Dep.</u> at 53; <u>see</u> transcript of G. Rutherfurd's voicemail to Donna Lee, attached to Lunetta Aff. at Exhibit 58 [MS A24743 - 44].

79.     On June 25, 2003, Plaintiff asked Morgan Stanley to confirm in writing that she was asked to stay home at the request of management, and Morgan Stanley did so.  <u>Pl. Dep.</u> at 532 - 33; <u>see</u> memo from Ms. Litvinsky to Plaintiff dated June 25, 2003, attached to Lunetta Aff. at Exhibit 57 [MS A24202].

80.     Mr. Rutherfurd, at Human Resource's direction, asked Plaintiff to return to work on June 26, 2003.  <u>Pl. Dep.</u> at 541; <u>see</u> memo from G. Rutherfurd to file dated June 30, 2003, attached to Lunetta Aff. at Exhibit 59 [MS A24210].  At that point, Mr. Rutherfurd asked Tom Moore and Kevin Jung, a

---

[9]     Pertinent portions of Donna Lee Litvinsky's Deposition are attached to the Lunetta Aff. at Exhibit ___.

more senior Executive Director and Portfolio Manager on the Core Growth Team, to supervise the June 30th rebalancing.  Pl. Dep. at 531; 542; Rutherfurd Dep. at 44 - 45.

I.      **The September 30, 2003 Reduction In Force ("RIF")**

81.     In 2001, Morgan Stanley merged four asset management companies into one.  Thereafter, the industry suffered through a three year bear market, resulting in a reduction in MSIM's assets under management and revenue.  McAlinden Dep. at 44 - 48.  In 2003, as a result of this decreased revenue and the inefficiencies caused by the merger of the four asset management companies, senior management required Morgan Stanley to undergo significant cost cutting measures.  McAlinden Dep. at 44 - 48.

82.     As part of this directive, Mr. Merin, then President of Morgan Stanley Investment Management ("MSIM"), directed Joe McAlinden, MSIM's then Chief Investment Officer, to reduce his budget by $15,000,000.  McAlinden Dep. at 44 - 45, 51; Merin Dep. at 114 - 15.

83.     In connection with this mandate, a decision was made to evaluate the Global Investor Group to determine where efficiencies and reductions could be made.  See Lunetta Aff. at Exhibits 60 [MS A27577 - 78].

84.     At Mr. McAlinden's request, in the spring/summer of 2003, Mr. Gupta requested an efficiency study of the GIG.  Gupta Dep. at 49-56; McAlinden Dep. at 46; 49.  Based on the results of the study, a determination was made to eliminate certain underperforming investment teams and to eliminate 14 "one off" positions where redundancies existed or efficiencies could be improved.  Gupta Dep. at 49-56; McAlinden Dep. at 56 - 59; Rutherfurd Dep. at 52; Merin Dep. at 85 - 86; 107; 115; see Exhibit 61 to Lunetta Aff. [MS A27592 – 641].

85.     As the Value Added Fund had become a purely passive fund, it no longer required a dedicated Portfolio Manager to run the fund.  Pl. Dep. at 505; see Lunetta Aff. at Exhibit 62 [MS

A24197 – 98]. Therefore, a decision was made that efficiencies could be gained by eliminating one of the two Index Portfolio manager positions. Gupta Dep. at 79; McAlinden Dep. at 55, 59; Merin Dep. at 83-85; see Lunetta Aff. at Exhibit 63 [MS A25013].

86. In deciding whether to retain Kevin Jung or Plaintiff, the two Index Portfolio Managers, their respective performance and breadth of experience within the Firm was considered. Gupta Dep. at 79, 90 - 91; Merin Dep. at 85 - 91; McAlinden Dep. at 58 - 59; see Lunetta Aff. at Exhibit 63 [MS A25014]. Discussions were held among Messrs. Rutherfurd, Gupta and McAlinden on this issue. Rutherfurd Dep. at 48 - 49; Gupta Dep. at 83; 89; Merin Dep. at 87.

87. At the time these decisions were being made, in late Spring/early Summer 2003 (Rutherfurd Dep. at 57 - 58; Merin Dep. at 78 - 79; Litvinsky Dep. at 32 - 33), the Value Added rebalancing issue had just occurred and was fresh in the minds of management. Gupta Dep. at 109-16; McAlinden Dep. at 63; Merin Dep. at 85-86. Plaintiff's perceived failure to comply with the Firm's directives was one of the factors that led to the decision to include her, rather than Mr. Jung, in the reduction in force. Gupta Dep. at 109 - 16; McAlinden Dep. at 63; Merin Dep. at 85-86.

88. It was also believed that Mr. Jung was more versatile and better diversified than Plaintiff. In addition to running his index funds, Mr. Jung worked with individuals and teams outside of the Core Growth team. Gupta Dep. at 79, 90 - 91; Merin Dep. at 85 - 91; McAlinden Dep. at 58 - 59.

89. In 2003, Mr. Jung was: (1) managing derivatives for the Growth Equities Group (Litvinsky Dep. at 56; Jung Dep. at 71); (2) trading for an international equity group (Jung Dep. at 73); (3) trading for the biotechnology and technology funds (Jung Dep. at 73); and (4) working with individuals in the active side of the Core Growth Group (Jung Dep. at 73). Thus, Mr. Jung was responsible for managing passive index funds and actively trading for other groups outside of the Core

Growth Group, which enabled the Firm to avoid hiring additional personnel.  Rutherfurd Dep. at 100-02.

90.     With respect to Mr. Jung's management of the deriviatives for Anita Kolleeny, Portfolio Manager for the Growth Equities Group, Mr. Rutherfurd testified:

> This was – this was huge business, with huge responsibilities, any error that ever would have been made on the futures with her, I notified the board and top management that any error in that area would begin with a million-dollar tag on it, and the top management had the kind of confidence in him to take on that risk.  And within the management of the futures, for example, Goldman Sachs came to me and told me that the trading that he did for Anita Kolleeny exceeded, in whichever year it was, the entire volume of Goldman Sachs' trading for their own account, to give some perspectives of the size of the – of that responsibility.  No. 2, in terms of initiative asking about him, he volunteered to back up and be part of Sherry Cohen's team on the global asset management, and this saved them having to hire somebody there.  This was not part of the responsibilities of the core growth group.

Rutherfurd Dep. at 100 - 02.

91.     Firm management believed that Mr. Jung's background and experience was broader than Plaintiff's, and that he could take over the funds managed by Plaintiff while continuing to perform his current duties.  Merin Dep. at 85.

92.     Plaintiff testified that in 2002 and 2003 she did not work with anyone outside of the Core Growth Group.  Indeed, Plaintiff stated that, other than her boss and her assistant, she did not work with anyone in those years.  (Pl. Dep. at 313; 316).  As a result, she could not identify a single individual with whom she worked for purposes of her 360 review in the year 2002.  Id.

93.     Plaintiff was selected for inclusion in the reduction in force in July 2003.  See Hosansky Aff. at ¶ 8; Litvinsky Dep. at 32 - 33.

94.     In addition to Plaintiff, 53 other individuals were let go in the GIG restructuring.  Two of those individuals, Gus Scacco and Brian Mazella, were from the Core Growth Group.

Rutherfurd Dep. 35; see Lunetta Aff. at Exhibits 63 [MS A25013 – 15], 64 [MS A27643 - 46].

**J.**   **Plaintiff's Complaints**

95.     In 1998, Plaintiff complained to her co-worker, Anita Kolleeny, that her supervisor, Ken Hinchliffe, was discriminating against her.  Complaint ¶¶ 41 - 42; Pl. Dep. at 97 - 98; see Lunetta Aff. at Exhibit 66 [WEISS 47 - 48].

96.     Against Plaintiff's wishes, her co-worker, Ms. Kolleeny, reported Plaintiff's complaint to Morgan Stanley Investment Management President, Mitchell Merin.  Complaint ¶ 42; Pl. Dep. at 98-99; Merin Dep. at 49-51; see Lunetta Aff. at Exhibit 66 [WEISS 43 - 49].

97.     Mr. Merin reported the complaint to a Morgan Stanley Human Resources representative to investigate Plaintiff's complaint.  Compl. ¶ 42; Pl. Dep. at 98; Merin Dep. at 49 - 51.  That individual spoke to Plaintiff about her concerns.  Compl. ¶ 42; Pl. Dep. at 98 -100.  Subsequently, her management was changed and she began reporting to Mr. Rutherfurd.

98.     On September 25, 2003, after being told that she was not up for promotion as part of the year-end 2003 cycle, Plaintiff told her direct supervisor, Guy Rutherfurd, that she believed that she was not being promoted due to her gender and age.  Compl. ¶ 69; Rutherfurd Dep. at 55 - 61; see transcript of G. Rutherfurd voicemail to D. (Lee) Litvinsky dated September 26, 2003, attached as Exhibit 58 to Lunetta Aff. [MS A24743 - 44].

99.     At the time Plaintiff complained to Mr. Rutherfurd on September 25, 2003, the decision had already been made to include her in the reduction in force.  Rutherfurd Dep. at 57-59; see Lunetta Aff. at Exhibit 58 [MS A24743 - 44].

100.    Mr. Rutherfurd immediately reported Plaintiff's complaint to Donna Lee, a Human Resources representative.  Rutherfurd Dep. at 59-60 see Lunetta Aff. at Exhibit 58 [MS A24743 – 44].

**K.**   **Guy Rutherfurd's Support of Plaintiff**

101.   Despite Plaintiff's allegations of discrimination against Mr. Rutherfurd, she admits that Mr. Rutherfurd supported her in numerous ways.  For example: (1) Mr. Rutherfurd encouraged and approved Plaintiff's attendance at a conference in Switzerland (Pl. Dep. 389-99); (2) gave Plaintiff the KLD Social Index Fund to manage (Pl. Dep. at 137; 193 - 99); (3) asked Plaintiff to speak to the Board (Pl. Dep. at 69); (4) gave Plaintiff more favorable reviews than those she does not accuse of discriminating against her (Pl. Dep. at 312; Lunetta Aff. at Exhibit 65 [MS A24466 - 85]); and (5) supported Plaintiff's requests to trade futures in the Value Added Fund (Pl. Dep. 418 -19).

102.   Furthermore, Mr. Rutherfurd disagreed with others who believed Plaintiff should be fired in 2003 over her management of the Value Added Fund.  Rutherfurd Dep. at 39; see Moore Aff. ¶ 14.

**L.**   **Plaintiff's Conferences and Speaking Opportunities**

103.   During her tenure as a Portfolio Manager, Plaintiff attended a number of seminars. These seminars were held in, and Plaintiff was flown to, Arizona, California and Switzerland – in addition to other local seminars.  Pl. Dep. 389-99; see Lunetta Aff. at Exhibit 65 [MS A24478].

104.   Plaintiff visited Morgan Stanley branch offices (see Lunetta Aff. at Exhibit 67 [Weiss 203]; participated in an international and worldwide teleconference call (see Lunetta Aff. at Exhibit 68 [Weiss 198]); participated in portfolio manager updates (see Lunetta Aff. at Exhibit 69 [Weiss 204-06, 211-13]); and participated in a portfolio manager roundtable with Joe McAlinden, the Firm's Chief Investment Officer (see Lunetta Aff. at Exhibit 71 [Weiss 93-94]).  These speaking opportunities occurred throughout her employment, beginning at least by 1991 and continuing through March 2003, only months before her termination.

Respectfully submitted,

Morgan, Lewis & Bockius LLP
Attorneys for Defendant


_____s/ Kimberley E. Lunetta_____
Amber L. Kagan
Kimberley E. Lunetta

1-PR/1353158.3